UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-60442-CIV-HUCK/DUBÉ

JULIO GUTIERREZ,

      Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Plaintiff (D.E. #16, #18)[1] and the Motion for Summary Judgment filed by the Defendant (D.E. #17) pursuant to a Clerk's Notice of Magistrate Judge Assignment entered by the Clerk of Court, United States District Court for the Southern District of Florida. The issue before this Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff, Julio Gutierrez (hereinafter "Gutierrez" or "Plaintiff").

### I. FACTS

On April 26, 2007, Gutierrez filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) alleging a disability onset date of January 1, 2004. (R. 82-86, 87-93).[2] The applications were denied initially and on reconsideration. (R. 60-81). An initial hearing was held on June 23, 2008. (R. 26-45). Following the hearing, the ALJ issued a decision

---

1. A duplicate copy of the Plaintiff's Motion for Summary Judgment was filed on August 6, 2010. (D.E. #18).

2. All references are to the record of the administrative proceeding filed as part of the Defendant's answer.

denying the request for benefits. (R. 14-25). A request for review filed with the Appeals Council was denied. (R. 1-5).

The Plaintiff, age 42 at the time of the hearing on June 23, 2008, testified he was born in San Salvador and moved to the United States in 1978. (R. 31). Gutierrez also testified he is a resident of the United States, is separated from his wife and lives with a friend from church. (R. 31-32). The Plaintiff stated he is right handed, 5'5" tall and weighed 160 pounds. (R. 32).

According to the Plaintiff, he has a driver's license, but does not have a car and the last time he drove was in 2004 when he got hurt at work. A friend from church drove him to the hearing. (R. 32-33). Gutierrez stated he has an eleventh grade education, but is not able to read or write in Spanish or English. (R. 34). Gutierrez claimed his last job was as a handyman for almost seven years. (R. 35). While working as a handyman he hurt his back using a blower and was driven to the hospital by a co-worker. The Plaintiff stated he was released from the hospital a couple of hours after arriving, and he continued to work for a month afterwards, but stopped due to pain. (R. 36-37).

The Plaintiff testified that after a month of working, he hired a lawyer because his employer did not want to send him to the hospital. (R. 37). The Plaintiff further testified he finally went to the hospital and an MRI was taken of his back which revealed a herniated disk at L5/S1. According to Gutierrez, he did not have surgery on his back, but was sent to therapy. (R. 38-39). Additionally, Gutierrez stated that "they found" problems with his heart. (R. 38). The Plaintiff submitted he is unable to work because his medications make him nauseous and sleepy. (R. 39-40).

Gutierrez stated he is able to walk a block; stand and/or sit for 10-15 minutes; lift about 10 pounds; and move his fingers, but is unable to bend or kneel. When asked what he does all day, he responded, "in the house." (R. 40). The Plaintiff submitted he settled his Workman's Compensation

case in 2004 for $25,000.00. Gutierrez testified he does not drink or smoke. (R. 41).

According to the Plaintiff, he was taken to the emergency room in 2007 because he had a minor stroke. Gutierrez claimed he was dizzy, had problems breathing and lost consciousness. (R. 41-42). The Plaintiff testified that when he does not take his medication or is exposed to the sun, he experiences dizziness and shortness or breath. (R. 42). The Plaintiff also testified that his cardiologists were Drs. De la Paz and Paster. (R. 43). Gutierrez also mentioned Dr. Soffer[3] from Memorial Hospital which he has not seen since April 2007. When asked by his attorney if there were any other problems he wanted the judge to know about, the Plaintiff responded: "I get too much nervous to -- so I just wanted to... go to a psychiatrist... I'm really depressed." (R. 44).

In addition to the testimony presented at the hearing, medical records were submitted to the ALJ. The Court notes that a portion of the medical record is duplicate copies. An MRI of the lumbar spine, performed on May 13, 2003, revealed herniation of the L5-S1 disc with extension into the right neural foramen and no central spinal stenosis. (R. 148).

Additionally, the record contains numerous reports of visits by the Plaintiff to the emergency room at Memorial Hospital (hereinafter "Memorial"). This Court will first set-out the pertinent records from Memorial.

On April 11, 2007, the Plaintiff was seen at Memorial with complaints of chest pain radiating to both sides of the chest since the prior day. Gutierrez reported losing consciousness for about an hour, but not seeking medical attention because he felt it was stress. Physical examination showed the Plaintiff was awake, alert and oriented times three; had full range of motion with no clubbing, cyanosis or edema; his chest was clear to auscultation; and his heart showed regular rhythm and rate

---

3. Incorrectly spelled as "Silfor."

with no murmur, thrill or gallop. (R. 155, 203). A chest x-ray and a CT scan of the brain taken on the same day were normal. (R. 156-157). Memorial's assessment was atypical chest pain and questionable recurrent syncopal episodes. (R. 156). An echocardiogram taken on April 12, 2007, showed EF 50%-55%, mildly dilated atrium, mild mitral regurgitation and tricuspid regurgitation, mild pulmonic insufficiency, and aortic sclerosis with trace aortic insufficiency. (R. 210).

On April 26, 2007, the Plaintiff was seen again at Memorial's emergency room and diagnosed with atypical chest pain and anxiety. (R. 161). The Plaintiff was released the same day with instructions to follow-up with his doctor within 3 days. (R. 170).

The Plaintiff was admitted to Memorial on May 11, 2007 with complaints of chest discomfort and loss of consciousness "for a few seconds." (R. 211). After being seen by Dr. Cohen, cardiologist, the Plaintiff was released the following day in stable condition. The recommendations upon discharge were to follow-up at primary care clinic and with Dr. Cohen; and to undergo an outpatient stress test and tilt table test. (R. 210). The Plaintiff was seen again at Memorial on June 25, 2007 with chest pain. (R. 214-215).

The Plaintiff was admitted at Memorial on July 31, 2007, with multiple episodes of chest pain. (R. 220-223, 251-254). A CT scan of the chest revealed no evidence of active air-space disease. (R. 262). The Plaintiff was discharged on August 2, 2007, with a diagnosis of coronary artery disease, myocardial bridging, atypical chest pain, hypertension, and hyperlipidemia. (R. 220).

On October 10, 1007, the Plaintiff went to the emergency room at Memorial with complaints of having swallowed a pill the night before and it was still in his throat. (R. 275). On October 15, 2007, he was admitted to Memorial with complaints of chest pain and kept overnight. (R. 292-293). Examination revealed no shortness of breath; no acute distress; clear lungs; and regular rate and

rhythm. He was discharged on October 16, 2007, with the following assessment: chest pain, history of myocardial infarction; mild cardiolyopathy; and hypertension, controlled. (R. 294-295).

The Plaintiff returned to Memorial on November 3, 2007 with complaints of chest pain associated with shortness of breath, palpitations and sweating. His chest was clear and his heart rhythm and rate were normal. (R. 305). A CT scan of his chest was normal. (R. 309).

Following are the medical records, in pertinent part, of various consultative examiners, along with the medical notes from a cardiac catheterization performed on the Plaintiff.

On May 21, 2007, the Plaintiff underwent a physical consultative examination by Dr. Michele Morrison. (R. 172-177). The Plaintiff complained of leg cramps and low back pain after his job injury. Additionally, Gutierrez reported back and joint pain with limitation of movement. However, he denied any chest pain, palpitation, dizziness or lightheadedness. (R. 172-173). The examination revealed that Gutierrez was in no acute distress, and awake, alert and oriented. He related well with the office staff, was cooperative with the physical examination and ambulated with a steady gait. Dr. Morrison noted that his chest and lungs were clear with normal sinus rhythm, no murmurs, no gallop and no rubs; and his back had a normal curvature with no spinous process tenderness, no paravertebral muscle spasms, no swelling heart or redness, and his flexion complete. The Plaintiff completed a straight leg-raise with pain to his lower back. (R. 173). Normal strength was found in his right leg, Gutierrez was able to heel and toe walk, and his range of motion was normal in all areas. (R. 174-177). Dr. Morrison's impressions were bilateral wrist and back pain. (R. 174).

On July 16, 2007, the Plaintiff underwent a psychological consultative examination by Dr. Beatriz Cabrera. (R. 178-179). The Plaintiff's chief complaint was low back pain. Gutierrez was

accompanied to the evaluation by a friend and Dr. Cabrera noted that both were "poor historians." Dr. Cabrera also noted that it was "important to note that Mr. Gutierrez feigned hallucinations, disorientation, and deficits in immediate recall and his report is therefore not a reliable one." When recounting his medical history, the Plaintiff stated he felt nervous and "very depressed," but denied any prior psychiatric history. (R. 178). Dr. Cabrera's diagnosis included malingering; cardiac condition, elevated cholesterol, high blood pressure and back problem; unemployment, lack of healthcare coverage; and she assigned Gutierrez a GAF of 75. (R. 179).

A Psychiatric Review Technique form completed by a non-examining state agency psychologist on July 23, 2007, stated that Gutierrez had a non-severe schizophrenic, paranoid and other psychotic disorders, affective, somatoform and personality disorders. (R. 180-193). The technique also found that the Plaintiff had "mild" difficulties in maintaining social functioning and concentration, persistence, or pace. (R. 190). Comments written at the end of the evaluation state that the Plaintiff was exaggerating/malingering in pursuit of secondary gain, and that he continued to function adequately in a full range of routine activities of daily living within his physical and motivational/volitional parameters. (R. 192).

On July 24, 2007, the Plaintiff underwent a cardiac catheterization due to a 3-month history of ongoing palpitations with associated shortness of breath and chest discomfort. (R. 217-218, 232). The assessment revealed a mildly to moderately depressed left ventricular systolic function with estimated ejection fraction of 40-45%; mid-left anterior descending artery myocardial bridging; and angiographically free of significant disease left circumflex and right coronary artery. (R. 218, 232).

A Physical Residual Functional Capacity Assessment dated July 25, 2007, listed the primary diagnosis as back pain and hypertension. (R. 194-201). The assessment found that the Plaintiff was

able to occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds; stand/walk or sit for about 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (R. 195). There were no postural, manipulative, visual, communicative or environmental limitations noted. (R. 306-308).

A second Physical Residual Functional Capacity Assessment dated December 7, 2007, listed the primary diagnosis as a history of back pain, hypertension and leg cramp; and the secondary diagnosis as a history of hypothyroidism. (R. 318-325). The limitations found were identical to the ones listed on the July 25, 2007 assessment.(R. 319-322).

A second Psychiatric Review Technique form completed by a non-examining state agency psychologist on December 13, 2007, stated that Gutierrez had a non-medical determinable impairment. (R. 326-339). The technique was left blank, but for the consultant's notes which stated that the Plaintiff was uncooperative with the Mental CE and exaggerating symptoms. The consultant's notes further state the Plaintiff "may experience some mild depression related to his physical difficulties, his emotional reactions appear to be within normal limits and formal mental health treatment has not been currently required.... Based on the totality of evidence, [the Plaintiff] appears to be solely limited by his physical difficulties and there are no symptoms severe enough to support a mental diagnosis at this time." (R. 338).

The medical records from the Plaintiff's treating physician, Dr. Yira De la Paz, are as follows. On November 2, 2007, Dr. De la Paz's office notes indicated the Plaintiff was seen with complaints of chest pain with exertion, shortness of breath, left extremity edema, heart palpitations, fatigue and back pain. He was noted as having no headaches, weakness, numbness, burning sensations or seizures and his mood was "good and overall doing well, no insomnia." (R. 344). Gutierrez was diagnosed with coronary atherosclerosis unspecified vessel, disc disorder of the

lumbar spine, hypertension, hyperlipidemia, depressive disorder, heartburn and rhinitis. (R. 345).

On January 22, 2008, Dr. De la Paz completed a Medical Verification Form which stated the Plaintiff diagnosis as disc disorder lumbar, arteriosclerosis and hypertension. (R. 341). Under the "Employment" section of the form, the doctor opined that Gutierrez's condition did not permit him to work and the duration was noted for "lifetime" and she checked off the box which read "Unable to work." Additionally, in the "Activities" section of the form, Dr. De la Paz checked off "yes" when asked if the Plaintiff's condition permitted him to participate in other activities such as classroom activities, volunteer work, etc., and specifically noted that "no physical exertion due to cardiac issue and disc herniation." The expected duration of limitations on activities was noted by Dr. De la Paz as 99 years. Dr. De la Paz stated that the Plaintiff's most recent office visit was on November 2, 2007. She further stated that an ongoing therapy/ treatment plan had been prescribed on a weekly basis. (R. 341).

On April 18, 2008, Dr. De la Paz's office notes indicated the Plaintiff was seen with complaints of chest pain with exertion, shortness of breath, left extremity edema, heart palpitations, and numbness on his left leg from disc disease. Gutierrez stated to Dr. De la Paz that he will be "applying for disability." (R. 346). He was noted again as having no headaches, weakness, numbness, burning sensations or seizures and his mood was "good and overall doing well, no insomnia." (R. 346). Gutierrez was diagnosed with heartburn, coronary atherosclerosis unspecified vessel, hyperlipidemia, depressive disorder, disc disorder of the lumbar spine, hypertension, and rhinitis. (R. 347).

On June 24, 2008, Dr. De la Paz completed a Mental Capacity Assessment. (R. 362-363). The assessment found marked restriction in all the areas of the Plaintiff's ability to sustain

concentration and persistence and adaptation. Additionally, the Plaintiff would likely have over 4 absences in an average month. The assessment further found marked restrictions in the ability to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. All other areas of social interaction were found to have moderate restrictions. Dr. De la Paz opined that the Plaintiff is not a malingerer; and she did not answer the question of whether Gutierrez is capable of managing benefits in his or her own best interest, but rather put a question mark by the question. (R. 362-363).

Dr. De la Paz completed an Onset Date Questionnaire on June 30, 2008, which stated that Gutierrez has been unable to work since January 1, 2003, and that her opinion is based on direct observation/treatment and historical medical records. (R. 364).

The Plaintiff was seen by Dr. Ariel Soffer, treating cardiologist, on April 25, 2008, as a follow-up to a hospital visit due to chest pain. (R. 351-353). The Plaintiff complained of chest discomfort which occurs intermittently and claimed that exertion made it worse. The pain was noted as mild to moderate. (R. 351). Upon physical examination, Dr. Soffer noted the point of maximal impulse, S1 and S2 were normal, except for a I/VI systolic ejection murmur. Additionally, he noted no S3 or S4 gallop. (R. 352). Dr. Soffer's impression was angina, idiopathic cardiomyopathy and murmur for which he recommended a Thallium Stress test and an Echo Doppler test. (R. 353).

The Echo Doppler test was performed on May 6, 2008, and revealed, in pertinent part, that the tricuspid valve "visualized with normal structure and without evidence of stenosis WITH MILD REGURGITATION AND MILD PULMONARY HYPERTENSION. Pulmonic valve visualized with normal structure and without evidence of stenosis WITH MILD INSUFFICIENCY.

Pericardium appears normal. No pleural or pericardial effusion noted. No left ventricular thrombus notes." (R. 354).

On May 15, 2008, the Plaintiff returned for a follow-up visit and Dr. Soffer noted that the point of maximal impulse, S1 and S2 were normal. (R. 348-350). Additionally, there is no S3 or S4 gallop; no extra heart sounds were detected by auscultation; and no murmurs were noted. (R. 349). According to Dr. Soffer, the Plaintiff was oriented as to time, person and place and his mood was appropriate. Dr. Soffer's impressions were as follows:

> 1     Angina - Pt walked 10:00 minutes on treadmill and developed CP, no evidence of ischemia noted on thallium images of TST (stress test), Pt had negative cardiac cath 7/07 by Dr. Pastuer.
> 2     Idiopathic Cardiomyopathy: Hx of EF 40-45% by cardiac cath 7/07, T-wave analysis unremarkable, I recommend a MUGA scan prior to further recommendations.
> 3     Murmur...

(R. 350).

On October 31, 2008, the ALJ issued a decision finding that the Plaintiff suffered from residual effects of lower back injury which was severe, but did not meet or equal the severity in the listing of impairments. (R. 19-20).[4] The ALJ determined that the Plaintiff did retain the residual functional capacity function to perform the full range of sedentary work. (R. 20). The ALJ found that the Plaintiff could not return to his past relevant work, but considering the Plaintiff's age, education, work experience and RFC, Gutierrez could perform jobs which existed in significant numbers in the national economy, and thus, was not disabled. (R. 24-25).

---

4. The Plaintiff's Disability and Work History Reports dated April 26, 2007 (R. 94-111); handwritten application dated May 18, 2007 (R. 112-114); and testimony at trial (R. 26-45) attest that his alleged impairment is lower back pain. This Court notes that the Plaintiff did not allege a cardiac or mental impairment in any of his applications.

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Baker v. Sullivan, 880 F.2d 319, 321 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient

reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991); See also, Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The Plaintiff's first point of contention is that the ALJ erred by not giving controlling weight to the opinion of the treating physicians and by not providing good cause as to why the opinion was not given controlling weight. Specifically, the Plaintiff argues that Dr. De la Paz was given very little weight due to her brief treatment history with Gutierrez; and Dr. Soffer, the Plaintiff's treating cardiologist, is not mentioned or his treatment notes discussed by the ALJ.

The opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been seen when the treating doctor's opinion was not bolstered by the evidence; the evidence supported a contrary finding or the opinion was conclusory or inconsistent with the physician's own medical records. If the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate his reasons. See Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004).

Additionally, the regulations define a treating physician as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

> We or us refers to either the Social Security Administration or the State agency making the disability or blindness determination.
>
> You or your means, as appropriate, the person who applies for benefits or for a period of disability, the person for whom an application is filed, or the person who is receiving benefits based on disability or blindness.

20 C.F.R. § 404.1502.

In his decision, the ALJ set-out Dr. De la Paz's treatment records and concluded as follows:

> The undersigned gave very little weight to the reports and opinions of Dr. Yira De La Paz. She stated that she based her opinion of the claimant's disability on her direct observation and treatment, plus her review of his medical records. Dr. De La Paz determined that claimant has been unable to work since January 1, 2003, which is one year prior to claimant's alleged onset date. Also, claimant's pay records show that he earned $6,778 in 2003 which is indicative of substantial gainful activity. Her treatment history with the claimant is very brief. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence in the record, as in the current case. The undersigned noted that of all the medical evaluators, Dr. De La Paz is the only one who thought that claimant is disabled. (Exhibits 11F, 12F, and 14F).

(R. 23-24).

This Court disagrees with the Plaintiff and finds that the ALJ provided good cause to reject Dr. De la Paz's opinion. As noted above, the ALJ did not state that the weight given to Dr. De la Paz was based solely on sporadic treatment of the Plaintiff. The ALJ did state that based on Dr. De la Paz's opinion, the Plaintiff was found disabled one year prior to Gutierrez's alleged onset date;

and that Dr. De la Paz was the only doctor who thought the Plaintiff was disabled. Specifically, the ALJ noted that no "treating physician has credibly concluded that the claimant has an impairment severe enough to meet or equal a listing." (R. 20).

Additionally, as set-out above in detail, Dr. De la Paz examined the Plaintiff for the first time on November 2, 2007 and her medical notes mainly contain the Plaintiff's subjective complaints. (R. 344-345). The Plaintiff's second visit with Dr. De la Paz appears to be for the sole purpose of having her complete the Medical Verification Form and for prescription refills. (R. 341-343). At this point, Dr. De la Paz opined that the Plaintiff is disabled for a lifetime and unable to work due to "cardiac issue and disc herniation." (R. 341).

The Plaintiff returned to Dr. De la Paz on April 18, 2008 and the medical notes are similar to the medical notes from the November 2, 2007 visit. (R. 346-347). In both visits, Dr. De la Paz noted the Plaintiff's mood as "good and overall doing well." (R. 344, 346). However, on June 24, 2008, Dr. De la Paz completed a Mental Capacity Assessment, which is set-out above in detail, wherein she checked-off "marked" on all the categories in concentration and persistence, and adaptation; and almost all categories in social interaction. (R. 362-363). These extreme findings by Dr. De la Paz are inconsistent with the medical record before this Court including Dr. De la Paz's own treatment notes. Therefore, it is the opinion of this Court that this is not a case of the ALJ simply rejecting a treating physician on the basis of a brief or sporadic treatment history.

This Court finds that the ALJ's report met the standard set forth by the Eleventh Circuit by specifically stating his reasons for giving little weight to the treating doctor's opinion. As the ALJ's decision to give little weight to the Plaintiff's treating physician's opinion was based on the overall record evidence, it is the opinion of this Court that the decision was based on substantial evidence.

Next, the Plaintiff argues that the ALJ did not mention Dr. Soffer, the Plaintiff's treating cardiologist, or discuss his treatment notes.

This Court disagrees with the Plaintiff. While the Plaintiff contends that the ALJ erred in not mentioning Dr. Soffer by name, a review of the ALJ's decision reveals that Dr. Soffer's notes were reviewed by the ALJ and included in his decision. Specifically, the ALJ mentioned Gutierrez's visit with Dr. Soffer at Memorial and noted that "he was consistently released within 48 hours when no problems that required continued hospitalization were found to exist." (R. 20). Next, the ALJ set-out the Plaintiff's extensive record of treatment from Memorial and noted as follows:

> Most of the treatment at Memorial Hospital was for claimant's heart complaints, rather than his lower back. Those doctors performed extensive testing and thorough examinations, but they could not find any basis for determining claimant's heart condition would disable claimant to the extent that he would not be able to work. Therefore, the summary of treatment at that hospital is noted, but it is not determinative. (Exhibits 2F, 7F, 8F, 13F).

(R. 23).

In his determination, the ALJ also set-out the Plaintiff's May 2008 stress test which assessed Gutierrez's heart condition as essentially normal with mild regurgitation and mild pulmonary hypertension. (R. 21). Therefore, any such error of the ALJ not mentioning Dr. Soffer by name in his determination was harmless, given the fact that the ALJ's decision contained Dr. Soffer's medical records. There is no reason to disturb an ALJ's decision if his or her error was harmless. See Diorio v. Heckler, 721 F. 2d 726, 729 (11th Cir. 1983). It is the opinion of this Court that no error is found on this basis.

The Plaintiff's second point of contention is that the ALJ's RFC determination was not supported by substantial evidence.

The residual functional capacity is an assessment which is based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997), citing, 20 C.F.R. § 404.1545(a). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess... her work-related abilities on a function by function basis.... Only after that may RFC be expressed in terms of exertional levels of work, sedentary, light, medium, heavy, and very heavy." Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007).

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p (4).

Furthermore, although an RFC finding is part of the medical portion of a disability adjudication, an ALJ has the duty to formulate an RFC based on all the relevant, credible evidence of record, not just the medical evidence of certain doctors or a specific medical opinion. See 20 C.F.R. §416.945; SSR 96-8p.

In the instant case, the ALJ went through all the evidence of record prior to making his final RFC determination. He properly determined the Plaintiff's testimony, reviewed the treating and non-treating physicians' opinions and records, and properly assigned little weight to the opinion on the Plaintiff's treating physician. After said evaluation, the ALJ determined that the Plaintiff maintained the RFC for the full range of sedentary work considering Gutierrez's age, education, and work experience. (R. 25). As the ALJ based this decision on all the evidence of the record, it is this Court's opinion that the ALJ's opinion is supported by the substantial evidence in the record.

The Plaintiff's final point of contention is that the ALJ erred in not requiring vocational expert testimony at the hearing.

Testimony from a vocational expert is highly valued and commonly obtained in order to establish the availability of suitable alternative jobs for disability claimants. Holley v. Chater, 931 F. Supp. 840, 851, (S.D. Fla. 1996). Further, the ALJ has the obligation of developing a full and fair record regarding the vocational opportunities available to a claimant. Foote v. Chater, 67 F. 3d 1553, 1558 (11th Cir. 1995), citing Allen v. Sullivan, 880 F. 2d 1200, 1201 (11th Cir. 1989). However, first, the claimant bears the initial burden of proving that he/she is unable to perform her previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work performed, not to merely a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

Further, The use of the grids is appropriate under step 5 unless the claimant is unable to perform a full range of work at the given residual functional level or if the claimant has non-exertional impairments that significantly limit basic work skills. Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004). "Significantly limit basic work skills" has been interpreted as limitations which would prohibit the person from performing a "wide range" of work at the given work level. Id. at 1243. If the ALJ makes a determination that the nonexertional limitations do not significantly limit basic work skills, the ALJ may properly rely on the grids to determine if the claimant is disabled. Id. However, this requires a specific finding by the ALJ. Id. at 1244, quoting, Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

Based on the Court's findings regarding the Plaintiff's first two points of contention, the Plaintiff's third argument must fail. As the ALJ properly dismissed the opinion of the Plaintiff's

treating physician and properly concluded that the Plaintiff did not have non-exertional limitations and was capable of performing a full range of sedentary work, no vocational expert was required at step 5. It is therefore, the opinion of this Court that the ALJ's decision was supported by substantial evidence of the record and should be affirmed.

### III. **CONCLUSION AND RECOMMENDATION**

Based on the foregoing, this Court finds that the decision of the ALJ was supported by substantial evidence and that the correct legal standards were applied. Therefore, it is the recommendation of this Court that the decision of the Commissioner be **AFFIRMED**. Accordingly, the Motion for Summary Judgment filed by the Plaintiff (D.E. #16, #18) should be **DENIED** and the Motion for Summary Judgment filed by the Defendant (D.E. #17) should be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Paul C. Huck, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this 29 day of September, 2010.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE